## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEVERLY JACKSON, personally, and in her official capacity as CEO of the American Ñedicine Licensing Board, | 3:15 - CV - 750 (CSH) |
| Plaintiff, | |
| v. | |
| STATE OF CONNECTICUT DEPARTMENT OF PUBLIC HEALTH, Jewel Mullen, in her official capacity as Commissioner of the State of Connecticut Department of Public Health; Adrienne Anderson, in her official capacity as Investigations Supervisor of the State of Connecticut Department of Public Health and as an individual, | JUNE 20, 2016 |
| Defendants. | |

### RULING ON STATE DEFENDANTS' MOTION TO DISMISS [DOC. 28]

**HAIGHT, Senior District Judge:**

## I.   INTRODUCTION

*Pro se* plaintiff Beverly Jackson commenced this action for declaratory judgment "for the purpose of determining a question of actual controversy between the parties of whether . . . under the Supremacy Clause of the United States Constitution a federal trademark preempts an inconsistent state statute or regulation."  Doc. 1, at 3-4.  She brings the action against the Connecticut State Department of Public Health (the "Department") and two of its officials, Jewel Mullen, the

Commissioner, and Adrienne Anderson, the Investigations Supervisor.[1]  Plaintiff alleges that a Connecticut state statute "precludes [her] from  practicing her profession in violation of  rights secured by  the  federal [C]onstitution."[2]  *Id*., at 6.   The state statute in question is Conn. Gen. Stat. § 20-9(a), which provides that  "[n]o  person shall, for compensation, gain or reward, received or expected, diagnose, treat, operate for or prescribe for any injury, deformity, ailment or disease, actual or imaginary, of another person, nor practice surgery, until he has obtained such a license as provided in section 20-10, and then only in the kind or branch of practice stated in such license."[3]

Jackson, who  identifies herself as an "N.D., Doctor of Ňedicine,"  is the licensor of the "American Ňedicine Licensing Board, Inc.," a federal licensing agency organized and existing under the laws of the United States through its trademark" (Reg. No. 3,765,779).[4]  Doc. 1, at 2.   She

---

[1]   As Defendants assert, "[t]he Department of Public Health is an arm of the State charged with regulating various aspects of public health. The Commissioner is the head of the department and Adrienne Anderson is a health program associate in the investigations unit." Doc. 28-1, at 9 n.9.

[2]  Plaintiff alleges, for example, that "Defendant Adrienne Anderson, acting under color of law, threatened to take action against Plaintiff for practicing medicine" and "displayed a complete disregard for the registered trademark Doctor of  Ňedicine®." Doc. 1, at ¶ 7.

[3]  Plaintiff specifically points to the related penalty provisions of Conn. Gen. Stat. § 20-14, which provide  that "[a]ny person who violates any provision of section 20-9 shall be guilty of a class D felony."   Conviction of a class D felony may result in a term of imprisonment "not more than five years," Conn. Gen. Stat. § 53a-35a(8), or a fine in "an amount not to exceed five thousand dollars," Conn. Gen. Stat. § 53a-41.  *See* Doc. 1, ¶ 6 (alleging that "[t]he threat of prosecution is real and immediate" and may make Plaintiff "subject to criminal sanctions").

[4]  According to Plaintiff, this trademark was registered on March 30, 2010, and amended on June 25, 2013.  Doc. 1, at ¶ 2.   In her Complaint, Plaintiff states:  "The trademark Doctor of Ňedicine® identified under TESS at U.S. Serial Number 76699108 lists the certification statement for this particular trademark as follows: 'The certification mark as used by authorized persons is intended to certify that an individual has met the requirements of the American Ňedicine Licensing Board, Inc., and is licensed to provide services as a Doctor of Ňedicine.®'" *Id.* (quoting Ex. 1, "Certificate of Registration").

obtained this trademark to verify her "intent to validate licensure for the Doctor of Ñedicine® to provide 'alternative medical services related to the practice of functional diagnostics and natural medicine.'"[5] *Id.*

Plaintiff's central claim is that the United States Patent and Trademark Office has sanctioned her practice of Ñedicine and that by issuing her a trademark, the federal government preempted Connecticut's ability to regulate Ñedicine, even if, as Defendants assert, "Connecticut finds that the practice of Ñedicine constitutes the practice of medicine defined by the Connecticut General Statutes" without the requisite medical license.  Doc. 28-1, at 2.  Furthermore, in "[b]uilding off this central premise, Plaintiff also alleges that the Defendants' attempt to investigate her practices violate[s] the Lanham Act, the Sherman Act, the Dormant Commerce Clause, and the Fourteenth Amendment's freedom to contract provision."  *Id.*

Pending before the Court is the State Defendants' Motion to Dismiss this action pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6), Fed. R. Civ. P.  *See* Doc. 28.  First, Defendants assert that Plaintiff has failed to properly serve any of them so that the Court lacks personal jurisdiction over each and all of the Defendants, Fed. R. Civ. P. 12(b)(5).  Second, Defendants argue that the Eleventh Amendment provides sovereign immunity to the Connecticut Department of Public Health, as a state entity, and to Commissioner Mullen and Investigations Supervisor Anderson, in their official

---

[5]  In her brief in opposition to Defendants' Motion to Dismiss, Plaintiff explains that "[t]he diacritic symbol on the mark Doctor of Ñedicine® has made it a distinctive, famous, and unique chef-d'oeuvre."  Doc. 36, at 8.   The Court is puzzled by the description of the word "Ñedicine" as a "chef-d'oeuvre," a term which is generally defined as a masterpiece in art or literature. *See, e.g.*, http://www.merriam-webster.com/dictionary/chef%20d'oeuvre; http://www.oxforddictionaries.com/us/definition/american_english/chef-d'%C5%93uvre.

3

capacities, to the extent that Plaintiff seeks money damages.[6]  In addition, Defendants assert that Anderson is entitled to qualified immunity in her individual capacity.  Finally, Defendants maintain that to the extent Plaintiff seeks prospective relief, her claims are barred because Plaintiff fails to state any plausible claims that would entitle her to relief.  The Court resolves Defendants' motion to dismiss herein.

## II.  BACKGROUND

### A.  Conn. Gen. Stat. § 20-9(a)

The Connecticut General Statutes provide a comprehensive regulatory scheme overseeing the practice of medicine and surgery in Connecticut.  *See* Conn. Gen. Stat., Ch. 368a, 370.  Under these provisions, the Department of Public Health is the sole entity responsible for licensing physicians in Connecticut.  *See* Conn. Gen. Stat. § 20-10.  An individual who applies to the Department for a medical license must meet certain criteria; and no person shall practice medicine or perform surgery within the state without first obtaining such a license.  *Id.* §§ 20-9, 20-10.  Specifically, Conn. Gen. Stat. § 20-9(a) provides:

> No person shall, for compensation, gain or reward, received or expected, diagnose, treat, operate for or prescribe for any injury, deformity, ailment or disease, actual or imaginary, of another person, nor practice surgery, until he has obtained such a license as provided in section 20-10, and then only in the kind or branch of practice stated in such license.

In addition to determining whether applicants are eligible for permits, licensure, certification or registration, the Department conducts investigations into possible violations of the statutes or regulations.  Conn. Gen. Stat. § 19a-14(a)(6), (a)(10).

_____

[6] Consequently, in so arguing, Defendants suggest the Court lacks subject matter jurisdiction over these claims.

The Connecticut legislature created the Connecticut Medical Examining Board ("Board"), Conn. Gen. Stat. § 20-8a, which conducts the administrative hearings on charges issued by the Department.  Once the Board issues a final decision, that decision may be appealed to the Connecticut Superior Court pursuant to Conn. Gen. Stat. § 4-183(a).  In addition, the Board may issue an order to any person who is violating an applicable statute or regulation to immediately discontinue the violation.[7] Conn. Gen. Stat. § 19a-11.  The Board, through the Office of the Attorney General, may "petition the [Connecticut] superior court . . . for the enforcement of any order issued by it and for appropriate temporary relief or a restraining order."  *Id*.[8]

## B.    Plaintiff's Allegations

Plaintiff asserts that she is a licensee of the American Ñedicine Licensing Board, Inc. ("Board").[9]  Doc. 1 (Complaint), ¶ 1.  She claims that this Board is "an organization authorized by

---

[7]  In fact, according to Plaintiff, the Department of Health intends to issue [to her] a cease and desist order that would require [her] to cease and desist using [her] United States Certification Mark" to practice Ñedicine.  Doc. 39, at 4.

[8]  Conn. Gen. Stat. § 19a-11 provides, in relevant part:

Any board or commission listed in subsection (b) of section 19a-14 may, in its discretion, issue an appropriate order to any person found to be violating an applicable statute or regulation, providing for the immediate discontinuance of the violation. . . .The court may grant such relief by injunction or otherwise, including temporary relief, as it deems equitable and may make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside, in whole or in part, any order of the board or commission.

[9]The American Ñedicine Licensing Board, Inc., is a Connecticut corporation registered with the Connecticut Secretary of State.  *See* Doc. 1, Ex. 1. "Beverly Betancur" is the named president of the corporation, which was registered on July 12, 2004; and the official business address is "29 Orchard St. #2, Stamford, CT."   The currently designated Agent for the business is "Beverly P. Jackson," at 19 Silk St., Norwalk, CT." *See also* http://www.concord-sots.ct.gov/CONCORD.

the United States Patent and Trademark Office to license an individual as a Doctor of Ñedicine®, Ñ.D." *Id.* In support, she argues that this Board, a Connecticut corporation, registered a certification mark, "Doctor of Ñedicine," with the United States Patent and Trademark Office (Reg. No. 3,765,779).[10] *Id.*, ¶ 2. Thereafter, the Board began issuing "Physician Licenses," including the first such license, which she issued to herself. *Id.* & Ex. 2 ("Physician's License," No. ND00001, issued 8/12/09). Plaintiff alleges that this license "verifies that Beverly Jackson, Ñ.D., is licensed nationally as a physician to diagnose, treat, prescribe and practice alternative medicine." *Id.* Under said license, Plaintiff began treating individuals. *Id.*, ¶ 14 (*e.g.*, "the case of Shaun Sloley," whom Jackson allegedly treated "with Infoceuticals and acupressure for a mystery vomiting issue").

Moreover, Plaintiff issued "Physician Licenses" to others to practice Ñedicine, acting essentially as a parallel Board for regulating the practice of medicine in Connecticut. For example, Jackson set up the "American Ñedicine Board of Examiners," a review board established allegedly "to promote high standards of competency and to assure that the licensed professionals meet specific standards of education." *Id.*, ¶ 11. She also created the "United States Ñedicine Licensing Examination," which allegedly administers a three-part exam to applicants for licenses. *Id.* According to Plaintiff, in order to become a "Doctor of Ñedicine," one must pass the exam and graduate from an institution accredited by the "American Ñedicine Accreditation Board." *Id.* Jackson allegedly created such an "accredited" institution herself – the "American School of

---

[10] A certification mark is not a typical trademark or service mark. Rather, such a mark is owned by one person but may be used by others in connection with goods or services, which are thus certified as to quality and origin. 3 McCarthy on *Trademarks and Unfair Competition* § 19:91 (4th ed.). Specifically, a certification mark is designed to "certif[y] that the goods or services tested meet certain standards or conditions." *Id.* Therefore, "[o]ne who sees such a certification mark on a product or in connection with a service is entitled to assume that the product or service in fact meets whatever standards of safety or quality have been set up and advertised by the certifier." *Id.*

Ňedicine," "which was founded in 2010 to educate students in *Informational Medicine* related to quantum electrodynamics."[11]   *Id.* (emphasis in original).   She then established her own "Federal Department of Public Health," designed "to investigate and handle complaints against licensed practitioners and to protect the public's health, safety and welfare."   *Id.*

The Connecticut Department of Public Health began investigating Jackson's Ňedicine-related practices in May of 2013.   *Id.*, ¶ 18.   Plaintiff claims that to initiate the investigation, the Department issued her a subpoena duces tecum on May 1, 2013, requesting medical records.   *Id.*   She also alleges that she received a "threatening letter from the Department of Health accusing her of criminal misconduct for unlicensed practice" of medicine.   *Id.*   In that letter, the Department noted that it had been informed that Plaintiff had undertaken treatment of "a patient who had been diagnosed with a brain tumor, resulting in a delay in the patient resuming treatment with her physicians at Yale-New Haven Hospital who had diagnosed the brain tumor."   *See* Doc. 28-2 (Ex. 2).   The letter also stated that "[t]his delay caused the tumor to increase in size which was detrimental to the patient and adversely affected her health."[12]   *Id.*

In her Complaint, Plaintiff alleges that she has been harmed by the Department's ongoing investigation, claiming that the "Department has displayed a complete disregard for Plaintiff's federal license in an attempt to impose enforcement actions." Doc. 1, ¶ 18..   Furthermore, she asserts that

---

[11]   In addition, Plaintiff created a website for this school at http://nedicine.net.

[12]   The letter, written by Adrienne Anderson, was dated September 25, 2015 and  addressed to Allen L. Williams, III, counsel for Jackson, with respect to the Department's investigation. Because the letter was incorporated by reference into Plaintiff's Complaint,  the Court may consider its contents in making this ruling.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (for purposes of Rule 12(b)(6) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

the Department, "by and through Defendant Adrienne Anderson, has refused to acknowledge that Plaintiff is authorized to practice *Ňedicine* under federal authority."[13]  *Id.* (emphasis in original).

Plaintiff summarizes her case as "all about the Defendants refusing to acknowledge a Federally USPTO issued Certification Mark, attempting to rename it with their own definition and scope of practice, thus creating a different field by their own self imposed definition and thus making it illegal under state law as a result of their own mischaracterization of the true identity of the mark." *Id.*, ¶19.  For relief, Plaintiff requests the Court to issue a declaratory judgment that her certification mark preempts Connecticut from regulating the practice of medicine as defined by the Connecticut General Statutes.  *Id.*, ¶¶ 32- 35.  She also prays for injunctive relief to prevent Defendants from enforcing Conn. Gen. Stat. § 20-9(a), which would otherwise bar her practice of Ňedicine.  Finally, Plaintiff seeks $27 million in punitive damages "and all other proper relief."  *Id.*, ¶ 35.

## C.   <u>Prior Similar Actions</u>

   1.   ***Betancur v. Florida*, No. 4:06-cv-428 (RH/CWS), 2008 WL 506305 (N.D. Fla., Feb. 1, 2008), *aff'd*, 296 F.App'x 761, 763  (11th Cir. 2008), *cert. denied*, 555 U.S. 1213 (2009)**

 The Court takes judicial notice that Plaintiff and one of her licensees previously litigated claims similar to those presented here in other federal courts without success.  For example, Plaintiff initiated an extremely similar action against the Florida Department of Health and three state public health officials in the Northern District of Florida.[14]  As in the case at bar, Plaintiff sought

---

[13] In addition, Jackson alleges that "[t]here have been other questionable arrests of physicians that have been charged with the unlicensed practice of medicine, with full knowledge that said Doctors were licensed under federal authority, to practice as a Doctor of Ňedicine®."  Doc. 1, ¶ 18.

[14] The individual defendants in Betancur's action  included: Timothy M. Cerio, the General Counsel for the Florida Department of Health; Dr. Rony Francois, the Secretary for the Florida

declaratory judgment regarding "whether or not under the Supremacy Clause . . . a federal trademark pre-empts an inconsistent state statute or regulation."  *See Betancur v. Florida*, No. 4:06-cv-428 (RH/CWS), 2008 WL 506305, at *1 (N.D. Fla., Feb. 1, 2008), *aff'd*, 296 F.App'x 761, 763 (11ᵗʰ Cir. 2008), *cert. denied*, 555 U.S. 1213 (2009).

The named plaintiff in this Florida action was "Beverly Betancur."  The named plaintiff in the case at bar is "Beverly Jackson."  The Connecticut defendants in the instant case say in their brief [Doc. 28-1] at 4 n.2: "Upon information and belief Beverly Betancur and Plaintiff Beverly Jackson are the same person."  Plaintiff does not dispute that assertion in her submissions.  Publicly available records identify a "Beverly Jackson, Age 58" as having the alias "Beverly J. Betancur."  *See* www.publicrecords360.com  (visited June 20, 2016).  "Henry A. Betancur," age 55, also known as "Henry A. Betancourt," is listed as a resident of Norwalk, CT, and related to "Beverly Bentancur" and "Beverly Jackson – 58," www.radaris.com (visited June 20, 2016).  The "Ancestry" website recites that "Henry A. Betancur" was married in Connecticut to "Beverly J. Jackson."  *See* www.search.ancestry.com (visited June 20, 2016).

Recitations of relevant facts appear to refer to the conduct of the same individual.  *Compare* the American School of Ñedicine's website (visited June 20, 2016): "The story begins when Dr. Beverly Jackson established the American Nedicine Licensing Board in 2004 to protect the rights of professionals in the alternative medical field to allow them to practice legally throughout the 50 states" *with* the Eleventh Circuit's statement of background facts in the cited case: "Betancur applied to the Florida Department of Health in 2004 for a license to practice naturopathy.  After the

---

Department of Health; William N. Meggs, the State Attorney for the State of Florida; and Dr. Ana M. Viamonte Ros, Secretary of the Department of Health.  *Betancur v. Florida*, 2008 WL 506305, at *1.

Department of Health denied Betancur's application, Betancur founded the Naturopathic National Council in Connecticut. The Council purported to be 'a national licensing agency.'"). 296 F. App'x at 762.

In these circumstances, the Court's discussion in this Ruling accepts that, as Defendants stated on information and belief, Beverly Jackson, the Plaintiff in the case at bar, and Beverly Betancur, the plaintiff in the other cases cited in this Part, are the same person.

In *Betancur*, Plaintiff had founded the "Naturopathic National Council," a Connecticut corporation, which she alleged was a "national licensing agency."[15] 296 F.App'x at 762. The "Council" registered its name as a trademark and thereafter issued Plaintiff a document stating that she was "nationally licensed" as a "Doctor of Naturopathy, N.D."[16] *Id.* at 763. After the Florida Department of Public Health initiated an investigation into her activities and informed her that the practice of "naturopathy" without a state medical license was a third degree felony, she sued both that department and its various public officials, asserting that they "violated her rights under the Tenth and Fourteenth Amendments by denying her a license to practice naturopathy." *Id.* at 763. The defendants moved to dismiss the complaint, and the district court granted their motion. The Eleventh Circuit affirmed, holding as follows:

> States retain the police power to regulate professions, such as the practice of
> medicine. *Watson v. State of Maryland*, 218 U.S. 173, 176, 30 S.Ct. 644, 646, 54

---

[15] It would appear that the "Naturopathic National Council" was replaced by the "American Ñedicine Licensing Board" in that the former is now listed as "inactive," whereas the latter is "active" and is the cross-referenced entity for the former in the records of the Connecticut Secretary of State. *See* http://www.concord-sots.ct.gov/CONCORD (accessed June 20, 2016) (showing "Business ID" for "American Nedicine Licensing Board, Inc." with "Old Name" of "Naturopathic National Council, Inc.").

[16] Instead, Plaintiff now calls herself "Doctor of Ñedicine, N.D."

L.Ed. 987 (1910) (recognizing the authority of the states to regulate the practice of
medicine). Betancur offers no rational argument that her ownership of the mark
"Naturopathic National Council, Inc." preempts the authority of Florida to regulate
and license the practice of naturopathy. Betancur's complaint of trademark
infringement, which is based on her argument that the Council has the exclusive right
to regulate the practice of naturopathy, also is meritless.

296 F. App'x at 763-64.

Furthermore, the Eleventh Circuit found that "Betancur's complaint that Florida violated her

civil rights also fail[ed]" in that the Florida state statute was "not an arbitrary or unreasonable

regulation that violated Betancur's right to equal protection." *Id.* at 764. Finally, "because Betancur

ha[d] no right under Florida law to be granted a [medical] license and ha[d] no liberty or property

interest protected by due process," her "final argument that the refusal to license naturopaths

deprive[d] her of the opportunity to pursue her livelihood [did] not, as she contend[ed], implicate

the Thirteenth Amendment, which prohibits forced servitude." *Id.*

### 2. *Jonson v. State of Washington*, No. 2:15-cv-00501 (W.D. Wa. 2015)

In addition, in the District of Washington, C. Hugh Jonson, one of Plaintiff's licensees of

Ňedicine, recently brought an action much like the one at bar; and the district court dismissed all

claims with prejudice. *See Jonson v. State of Washington*, No. 2:15-cv-00501 (W.D. Wa. 2015), at

Doc. 30 (unpublished "Order on Motion to Dismiss," dated June 23, 2015). In that case, Jonson

alleged that, as a licensee of the "American Ňedicine Licensing Board, Inc.," he should be permitted

to practice "Ňedicine," an "alternative health care" on Washington State residents. *Id.*, Doc. 17

(Amended Complaint, ¶¶ 1, 10).

Jonson asserted that the American Ňedicine Licensing Board operated under the authority

of the same trademark at issue in this action, which was registered on March 30, 2010 and amended

11

on June 25, 2013.  *Id.*, ¶ 2.  As in the case at bar, Jonson argued that the State regulatory agency –
the Washington State Department of Health – should not be allowed to prevent him from practicing
"Ňedicine" under its regulatory provisions.   In so doing, he claimed violations of the 10th
Amendment and Supremacy Clause; the Lanham Act, 15 U.S.C. § 1125; 42 U.S.C. § 1983; the
Dormant Commerce Clause; the Thirteenth Amendment; and Washington's "Health Professions
Uniform Disciplinary Act" (UDA), Wash. Rev. Code 18.130, which provides that the unlicensed
practice of a health profession constitutes a crime (Wash. Rev. Code § 18.130.190).   The district
court dismissed Jonson's action with prejudice for failure to state a claim  pursuant to Rule 12(b)(6),
Fed. R. Civ. P., and specified that  "amendment would be futile."  Doc. 30, at 4.  In so ruling, the
court held that "the registration of trademarks does not even arguably conflict with the state
regulation of medicine."  *Id.* at 3.  Moreover, even "[i]f Plaintiff is licensed to use the mark, . . . he
is not thereby licensed to practice medicine as the state defines that practice for the health and safety
of its residents."  *Id.*  Finally, none of Plaintiff's "disparate constitutional claims which he claim[ed]
permit him to practice 'Ňedicine' . . . r[ose] to the level of plausibility."  *Id.*

Upon appeal, the Ninth Circuit stated that "[a] review of the record and the responses to the
order to show cause indicates that the questions raised in this appeal are so insubstantial as not to
require further argument."  Doc. 35 ("Order of U.S.C.A.") (Case No. 15-35584) (citing *United States
v. Hooton*, 693 F.2d 857, 858 (9th Cir. 1982) (*per curiam*)).  "Accordingly, [the Ninth Circuit]
summarily affirm[ed] the district court's order."  *Id.*; *see also* Doc. 36 ("Mandate of U.S.C.A.," dated
February 18, 2016).

**D.**     **Plaintiff's Present Legal Claims**

In the case at bar, Plaintiff pursues the following claims:  violation of the Lanham Act, unfair competition pursuant to  the Sherman Antitrust Act and Connecticut's Unfair Trade Practices Act, violation of her civil rights under 42 U.S.C. § 1983 (under the Fourteenth Amendment), preemption by the Supremacy Clause and federal trademark law, and violation of the Dormant Commerce Clause.   The Court will summarize each claim briefly.

**1.**     **Lanham Act**

Plaintiff attempts to frame her first claim under the Lanham Act.   In general, that statute "permits one competitor to sue another for unfair competition arising from false or misleading product descriptions." *POM Wonderful LLC v. Coca Cola Co.*, 134 S. Ct. 2228, 2230  (2014) (citing  15 U.S.C. § 1125).  Plaintiff alleges that the "State of Connecticut Department of Public Health is usurping the federal authority by attempting to trade on the recognition of the distinctive mark Doctor of  Ňedicine  in violation of Section 43(c) of the Lanham Act." Doc. 1, ¶ 20.  She asserts that by issuing the trademark, the federal government established the practice of Ňedicine, and the Connecticut Department of Public Health "is interfering with the [Ňedicine] trademark [by] unduly burdening interstate commerce." *Id.*, ¶ 21.  Furthermore, she alleges that the Department is "blurring [the trademark's] inherent distinctiveness by recklessly superimposing their impression with the Tradename Medicine."[17]  *Id.*  In addition, Plaintiff asserts that Investigative Supervisor

---

[17]     In her  brief in  opposition to  Defendants' motion  to dismiss,  Plaintiff argues that "Defendants are falsely claiming that Plaintiff is practicing mainstream medicine instead of alternative medicine in an attempt to take illegitimate control of the mark Doctor of Ňedicine.®" Doc. 36, at 5.  She attempts to distinguish "Ňedicine" as the practice of "alternative medicine," as opposed to "conventional medicine." *Id.*  She fails to address, however, that the State is entitled to define medicine for the purpose of protecting the public safety.

Anderson has violated 15 U.S.C. § 1125(a)(1)(A) by causing "trade identity confusion by attempting to overthrow the trademark Doctor of Ñedicine through false and misleading representation of Plaintiff's profession."[18] *Id.*, ¶ 27.

## 2.      Unfair Competition

As to her  federal claims under the Sherman Antitrust Act, 15 U.S.C. § 1,  Plaintiff alleges that Defendants have impaired her ability to compete in the medical field.[19]  Specifically, she alleges that Defendants have interfered with her trademark in violation of Section 1 of the Sherman Antitrust Act, thereby unreasonably restricting her trade.  Doc. 1, ¶ 22.  She concludes that "[s]uch restraint on trade is unconstitutional because it interferes with interstate commerce and invades the federal

---

[18]  15 U.S.C. § 1125(a)(1)(A) of the Lanham Act states, in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.


[19]  The Sherman Antitrust Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

14

government's exclusive right to regulate interstate commerce."[20]  *Id.*

Plaintiff also claims that Defendants are violating Section 2 of the Sherman Antitrust Act with their "dangerous intent on monopolizing the health care industry through anticompetitive conduct."  *Id.*  She claims, in particular, that "Defendants are making it impossible for [her] to engage in fair competition by restricting the trademark Doctor of Ñedicine®."  *Id.*

Finally, Plaintiff alleges that Defendants have violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a).  That statute provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. St. § 42–110b(a). "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b, may bring an action" to recover actual damages, punitive damages, and equitable relief. Conn. Gen. Stat. § 42–110g(a).  In the case at bar, Plaintiff alleges that the "State of Connecticut Department of Public Health is in violation of the rules of unfair trade practices by attempting to eliminate [its] direct competitor, thereby, preventing competition." Doc. 1, ¶ 22.

### 3.    **Preemption Claims**

Plaintiff claims, in conclusory fashion, that Connecticut is preempted by the Supremacy Clause of the United States Constitution and by federal trademark law from regulating the practice

---

[20]  As Defendants noted, "medicine is not a trademark," but rather defined in Connecticut as the practice of "diagnosing, operating or prescribing for any injury, deformity, ailment or disease, actual or imaginary, of another person," Conn. Gen. Stat. § 20-9. Doc. 28-1, at 9 n. 8.  Moreover, "none of the Defendants are medical practitioners actively involved in the practice of medicine." *Id.* n.9.

of Ñedicine.[21]  Doc. 1, ¶¶ 23-26, 32.  In support, she alleges that "[t]he United States Patent and Trademark Office has the Congressional power under the Commerce Clause to license Ñedicine physicians."  *Id.*, ¶ 23.  In addition, Plaintiff alleges that Congress, through the United States Patent and Trademark Office, has established Ñedicine; and acts of Congress preempt conflicting state law.  *Id.*, ¶ 24.  Plaintiff alleges that Connecticut may not, therefore, regulate Ñedicine because it is already regulated by federal trademark law.  *Id.,* ¶ 26.

### 4.    Section 1983 (Fourteenth Amendment) Claim

In addition, Plaintiff alleges that Defendants have violated the Fourteenth Amendment of the Constitution.[22]  Doc. 1, ¶ 28.  Citing this amendment, Plaintiff simply asserts that the Connecticut's Department of Public Health officials have "deprived [her of] the freedom to practice her profession for which she holds a federal license, in violation of her civil rights."[23]  *Id.*  She alleges  that the "state should not be interfering with [her] occupation" because the state has "already determined that

---

[21]  The Supremacy Clause provides, in pertinent part, that the United States "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land . . . ."  U.S. Const. art. VI, cl. 2.

[22]  Section 1 of the Fourteenth Amendment states:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

 U.S. Const. amend. XIV.

[23]  It is unclear from Plaintiff's Complaint which Fourteenth Amendment right she seeks to redress (*e.g.*, due process, a liberty interest, equal protection).  However, at one point she refers to an "inalienable" right of a citizen as the "liberty of contract."  Doc. 1, ¶ 28.

Ñedicine does not pose risk of harm." *Id.* In short, she argues that "Defendants are invalidating [her] economic freedoms," and in particular, impeding her "freedom of contract within state government restrictions." *Id.*. Plaintiff concludes that "[t]he aforementioned acts are equivalent to Constitutional Tort[s] pursuant to 42 U.S.C. § 1983 for deprivation of Plaintiff's rights under the United States Constitution." *Id.*

Furthermore, Plaintiff alleges that individual defendants Mullen and Anderson violated her § 1983 rights by "acting under color of law." In particular, she alleges that Mullen unlawfully "refus[ed] to remedy the violations of Plaintiff's rights." *Id.* Plaintiff further asserts that both Mullen and Anderson "exceeded their statutory powers or acted unconstitutionally by attempting to overthrow the federal authority." *Id.* In support, Plaintiff cites the Lanham Act provision which states that the ownership of a valid registered trademark is "a complete bar to an action against that person, with respect to that mark," brought "by another under the common law or a statute of a State." *Id.* (quoting 15 U.S.C. § 1125(a)(2)(6)).

### 5. <u>Dormant Commerce Clause Claim</u>

Finally, Plaintiff asserts a claim under the "Dormant Commerce Clause." "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (citations, internal quotation marks, and brackets omitted). *See also Selevan v. New York Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009).

In her Complaint, Plaintiff alleges that "Defendants are in violation of the Dormant

Commere Clause by attempting to usurp the licensing authority of the American Ñedicine Licensing Board, Inc., thereby interfering with Plaintiff's license that is inherent to the rights under U.S. Certification Mark, Reg. No. 3,765,779 as authorized under Section l(a) of the Trademark Act." Doc. 1, ¶ 29. She further alleges that Defendants are preempted from investigating her Ñedicine activities under the Dormant Commerce Clause.

### III.   DISCUSSION

Defendants move to dismiss Plaintiff's action on three bases: (1) insufficiency of service of process, Fed. R. Civ. P. 12(b)(5); (2) sovereign immunity, which equates with lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1); and failure to state a claim upon which relief may be granted, Fed. R. Civ. P. 12(b)(6).  The Court will examine each of these grounds for dismissal.

### A.   Rule 12(b)(2) - Insufficient Service of Process as to All Defendants

Defendants' first argument for dismissal of Plaintiff's Complaint asserts that Jackson failed to effect proper service upon Defendants and, therefore, the Court lacks personal jurisdiction over them.  Specifically, Defendants claim that Plaintiff never properly served the Department, Mullen, or Anderson with the summons and complaint under Rules 4(e) or 4(j), Fed. R. Civ. P., and/or under Conn. Gen. Stat. § 52-57.

### 1.      Standard of Law

In the absence of proper service, a district court lacks personal jurisdiction over those defendants not properly served. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).  In addition, "there must be a statutory basis for personal jurisdiction that renders

such service of process effective." 673 F.3d at 59. "The available statutory bases in federal courts are enumerated by Federal Rule of Civil Procedure 4(k)," which provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Id.* at 59-60 (citing *Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010) ("A district court's personal jurisdiction is determined by the law of the state in which the court is located.")). The Court must look to Connecticut law, as well as to the Federal Rules, in determining whether personal jurisdiction may be exercised with respect to Defendants.

"Under Rule 12(b)(5), [Fed. R. Civ. P.,] a party may file a motion to dismiss due to insufficiency of service of process." *Rzayeva v. United States*, 492 F.Supp.2d 60, 74 (D.Conn. 2007). "A motion to dismiss pursuant to Rule 12(b)(5) must be granted if the plaintiff fails to serve a copy of the summons and complaint on the defendants pursuant to Rule 4 of the Federal Rules [of Civil Procedure], which sets forth the federal requirements for service." *Id.* (citing *Cole v. Aetna Life & Cas.*, 70 F.Supp.2d 106, 110 (D.Conn.1999)). "Once validity of service has been challenged, it becomes the plaintiff's burden to prove that service of process was adequate." *Rzayeva*, 492 F.Supp.2d at 74 (citing *Cole*, 70 F.Supp.2d at 110).

In particular, pursuant to Rule 4(c), Fed. R. Civ. P., as it existed at the relevant time, "[a] summons must be served with a copy of the complaint" and "[t]he plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m)," *i.e.*, "within 120 days after the complaint is filed."[24] Moreover, under Rule 4(e), Fed. R. Civ. P., the means of serving an

---

[24]   The amendment to Rule 4(m), Fed. R. Civ. P., shortening "the presumptive period for serving a defendant from 120 days to 90 days" became effective on December 1, 2015. *See* "Committee Notes to Rule 4 - 2015 Amendment." Therefore, when Plaintiff attempted service in

individual from whom a waiver of service has not been obtained, include "delivering a copy of the summons and of the complaint to the individual personally;" "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there;" or "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e) (2)(A)-(C).

In addition, as to a state agency, such as the Connecticut Department of Public Health, Rule 4(j), Fed. R. Civ. P.,  dictates that, absent a waiver of service, that agency may be served by "delivering a copy of the summons and of the complaint to its chief executive officer;" or by "serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant." Fed. R.  Civ. P. 4(j)(2)(A)-(B).  With respect to the latter form of service, the applicable state law, Conn. Gen. Stat. § 52-64, sets forth the proper manner of service against the state and its employees, in their official capacity.  That statute provides, in relevant part:

> (a)  Service of civil process in any civil action or proceeding maintainable against . . .  the state or against any institution, board, commission, department or administrative tribunal thereof, or against any officer, servant, agent or employee of the state or of any such institution, board, commission, department or administrative tribunal, as the case may be, may be made by a proper officer (1) leaving a true and attested copy of the process, including the declaration or complaint, with the Attorney General at the office of the Attorney General in Hartford, or (2) sending a true and attested copy of the process, including the summons and complaint, by certified mail, return receipt requested, to the Attorney General at the office of the Attorney General in Hartford.

### 2.    Facts Regarding Service

In the case at bar, Plaintiff sued the Connecticut Department of Public Health, Jewel Mullen, in her official capacity as Commissioner of the Department, and Investigations Supervisor Adrienne

---

May of 2015, the former 120-day period of Rule 4(m) was in effect.

Anderson in her official and individual capacities.  To properly serve the Department and the two public officials in their official capacities, Plaintiff was required to serve a true and attested copy of the process (summons and complaint) on the Attorney General in Hartford.  *See* Conn. Gen. Stat. § 52-64(a).  A review of the proof of service Plaintiff filed with the Court reveals that, as Defendants point out, "Plaintiff has not served the Attorney General's Office." Doc. 28-1, at 13.   Instead, the Proof of Service states that the server, Zairon Rabim, attempted service on the State Department of Public Health on May 26, 2105 and such service was not effected. Doc. 8.  No address was indicated on the actual Proof of Service, which simply states that the Department "attempted to avoid service and refused to sign."  *Id.* However, in conjunction with her "Returns of Service," Plaintiff filed certified mail receipts showing that she sent service to the Defendants at "410 Capital Ave., MS #12HSR, P.O. Box 340308, Hartford, CT 06134."[25]  Doc. 9. The Department concedes that "no one accepted service of the complaint and summons" at said premises, Doc. 28-1, at 13, but this was because service must, pursuant to Conn. Gen. Stat. § 52-64, be made upon the Attorney General's Office.

Similarly, with respect to Commissioner Mullen, service was deficient in that it was made by certified mail to the Department at 410 Capitol Avenue in Hartford.  One "L. Guilford," who is not an authorized agent to accept service for Mullen, accepted service.  *See* Doc. 6.  Again, such service did not comport with Conn. Gen. Stat. § 52-64, which dictates that service upon an officer of a state department must be made on the Attorney General's Office.

Finally, service upon investigative supervisor Anderson was made upon the Department by

---

[25]  The Court takes judicial notice of the Department of Public Health's mailing address, as provided on its website, as "410 Capitol Avenue, P.O. Box 340308, Hartford, CT 06134." *See* http://www.ct.gov/dph.

certified mail to the 410 Capital Avenue address.  It was left with a "Marybeth Mendez," who is not

an authorized agent for service upon Anderson.  With respect to her official capacity as an

investigative officer, Anderson  must be served via the Attorney General's Office in Hartford. *See*

Conn. Gen. Stat. § 52-64.  In her individual capacity, Anderson must be served personally at her

dwelling or place of abode,  Fed. R. Civ. P. 4(e) (2)(A)-(C).  Accordingly, service was insufficient

on each and all of the Defendants.

In general, under Rule 4(m), Fed. R. Civ. P., as written at the relevant time, "[i]f a defendant

is not served within 120 days after the complaint is filed, the court – on motion or on its own after

notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that

service be made within a specified time."[26]  Under the present circumstances, the Court lacks

jurisdiction over defendants who were not properly served and, after the expiration of 120 days,

must either  dismiss the action without prejudice or order service by a set deadline.  *See* Fed. R. Civ.

P. 4(m);  *Eiden v. McCarthy*, 531 F.Supp. 2d 333, 343 (D.Conn. 2008).

When the plaintiff is a *pro se* litigant, as in this action, the Court generally exercises leniency

in the interest of justice and sets a final deadline for service.  For example, in her *pro se* capacity,

Plaintiff may have failed to comprehend the full details of the service requirements under Federal

Rule 4 of Civil Procedure and  Conn. Gen. Stat. § 52-57(a).  For instance, Plaintiff may not have

realized the necessity of serving the official Defendants by serving the Attorney General's Office in

Hartford.  After all, it would strain credulity to conclude that Plaintiff intentionally incurred time and

expense to send certified mail and/or to secure an officer for service to purposely effect imperfect,

and thus legally void, service.  Therefore, although Plaintiff has failed to make proper service, the

---

[26] *See* n.24, *supra*.

Court might be inclined, in the interest of justice, to  allow her one final attempt to make proper

service.  However, as set forth below, the Court must first consider whether Plaintiff's claims are

barred by the Eleventh Amendment and/or fail to state claims upon which relief may be granted.  If

so, her action must, in any event, be dismissed.

### B.     Lack of Subject Matter Jurisdiction, Fed. R. Civ. P. 12(b)(1) - Sovereign Immunity under the Eleventh Amendment

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it."  *Luckett v. Bure*,

290 F.3d 493, 496 (2d Cir.2002) (internal quotation marks and citations omitted).

The Eleventh Amendment of the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit
> in law or equity, commenced or prosecuted against one of the United States by
> Citizens of another State, or by Citizens or Subjects or any Foreign State.

U.S. Const. amend. XI.  Because the United States Supreme Court has interpreted the language of

the Eleventh Amendment to bar federal jurisdiction over suits against states, this amendment, when

applicable, deprives the Court of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1).  *See Kimel v.*

*Florida Board of Regents*, 528 U.S. 62, 73 (2000).  *See also Benoit v. Connecticut Dep't of Motor*

*Vehicles*, No. 3:10-CV-1007 (JBA), 2012 WL 32962, at *2 (D. Conn. Jan. 6, 2012); *Pham v.*

*Connecticut Dep't of Children & Families*, No. 3:09-CV-1869 (CFD), 2010 WL 4167217, at *2 (D.

Conn. Oct. 15, 2010).  "State immunity extends to state agencies and to state officers who act on

behalf of the state." *Burnette v. Carothers*, 192 F.3d 52, 57 (2d Cir. 1999)(citing  *Puerto Rico*

*Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc*., 506 U.S. 139, 142-47 (1993)).  Thus, when the

state is the real party in interest, the Eleventh Amendment generally bars federal court jurisdiction

over an action against a state official acting in his or her official capacity. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984).[27]

Federal district courts are courts of limited jurisdiction under Article III, Section 2 of the United States Constitution. *See, e.g., Chicot Cnty. Drainage Dist. Baxter State Bank*, 308 U.S. 371, 376 (1940), *reh'g denied*, 309 U.S. 695 (1940). Therefore, "[d]etermining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.2008) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008) (internal citations and quotation marks omitted)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). *See also Tomasko v. W. Connecticut State Univ.*, No. 3:11-CV-1020 (CSH), 2012 WL 877293, at *1 (D. Conn. Mar. 14, 2012).

In this action, Plaintiff asserts various claims, including three under federal statutes: 42 U.S.C. § 1983, the Lanham Act, and the Sherman Antitrust Act. In each, she has named as defendant the State of Connecticut Department of Health, referred to herein as the "Department," state employees Mullen and Anderson in their official capacities (as Commissioner and

---

[27] A notable exception to this rule was created by the United States Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908), holding that the Eleventh Amendment does not bar suits for prospective relief against state officials acting in violation of federal law because such action is not considered an action of the state. *See also Burnette v. Carothers*, 192 F.3d 52, 57 n.3 (2d Cir. 1999).

Investigations Supervisor, respectively) and Anderson in her individual capacity.[28] For the reasons set forth below, these claims are all barred and/or fatally defective.

### 1.    <u>Section 1983</u>

With respect to Plaintiff's § 1983 claim, "under the Eleventh Amendment, States enjoy an immunity from suit in federal court by all private parties for all causes of action, including suits arising under federal statutes." *Gaynor v. Martin*, 77 F. Supp. 2d 272, 281 (D. Conn. 1999) (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 98 (1984)).  In particular, "[i]t is well established that Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983." *Sargent v. Emons*, 582 F.App'x 51, 52 (2d Cir. 2014) (summary opinion, citing *Quern  v. Jordan*, 440 U.S. 332, 345 (1979) and holding "the district court correctly found that the Eleventh Amendment bars [plaintiff's] suit against the Judicial Branch of the State of Connecticut"). *See also Dube v. State Univ. of New York*, 900 F.2d 587, 594-95 (2d Cir.1990) (holding  Eleventh Amendment bars a Section 1983 action against the State).

Furthermore, Eleventh Amendment "immunity applies to State agencies and departments, as well." *Gaynor*, 77 F.Supp. 2d at 281.  And because "official capacity suits are regarded as another form of claim against the State itself, the Eleventh Amendment likewise bars actions instituted against individually named State officials sued in their official capacities." *Id.* (citing  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).[29]  *See also Berman Enter., Inc. v. Jorling,* 3 F.3d 602, 606 (2d

---

[28]   The Department of Public Health is a Connecticut State agency. "There is established a Department of Public Health." Conn.Gen. Stat.§ 19a-1a.

[29]   *See* further discussion of exceptions to Eleventh Amendment immunity at Part III.B.4., *infra.*

Cir.1993) ("To the extent that the [Section 1983] suit sought damages from defendants in their official capacities, dismissal under the eleventh amendment was proper because a suit against a state official in his official capacity is, in effect, a suit against the state itself, which is barred.").

On the other hand, the Eleventh Amendment does not preclude suits against state officers in their official capacity *for prospective injunctive relief* to prevent a continuing violation of federal law. *Ex parte Young*, 209 U.S. 123, 155–56 (1908). *See also Henrietta D. v. Bloomberg*, 331 F.3d 261, 287 (2d Cir.2003); *Credle Brown v. Connecticut*, 502 F. Supp. 2d 292, 298 (D. Conn. 2007), *adhered to on reconsideration*, 246 F.R.D. 408 (D. Conn. 2007).

Moreover, "state officials sued in their individual capacities are not immune from personal liability pursuant to § 1983." *Credle-Brown*, 502 F.Supp.2d at 299-300 (citing *Hafer v. Melo*, 502 U.S. 21, 31 (1991)). In particular, "damages awards against individual defendants under § 1983 are permissible" because although "imposing personal liability on state officers may hamper their performance of public duties[,] . . . such concerns are properly addressed within the framework of our personal immunity jurisprudence." *Credle-Brown*, 502 F.Supp. 2d at 299-300 (citing *Hafer*, 502 U.S. at 30-31).

### 2.   **Lanham Act**

Just as the Eleventh Amendment precludes suits against the State in § 1983 actions, such immunity also exists with respect to the Lanham Act, 15 U.S.C. § 1125(a), and the Sherman Act, 15 U.S.C. § 1. First, with respect to the Lanham Act, the United States Supreme Court reaffirmed its holding in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), that the "power to regulate Commerce conferred by Article I of the Constitution gives Congress no authority to abrogate state sovereign

immunity."[30]  *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 671 (1999).  In particular, the language of the Lanham Act that provides for actions against the state, under the Trademark Remedy Clarification Act, did not validly abrogate the State's sovereign immunity.  *College Sav. Bank,* 527 U.S. at 671-75.  *See also Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 209 (D. Conn. 2005) (in action including claims that defendants violated plaintiff's rights under § 43(a) of the Lanham Act, 11 U.S.C. § 1125(a),  "the Court note[d] from the record before the Court and as confirmed at oral argument, that because of Eleventh Amendment state sovereign immunity, [plaintiff] ha[d] wisely abandoned any and all federal claims against Defendants University of Connecticut ('UConn' or the 'University') and UCHC, as well as any and all claims for money damages against the Defendants in their official capacities").  *Accord Utah Republican Party v. Herbert*,  141 F.Supp.3d 1195, 1200 (D. Utah 2015) ("*College Savings Bank* made clear that the Trademark Remedy Clarification Act did not abrogate sovereign immunity for actions brought under the Lanham Act"); *Virginia Polytechnic Inst. & State Univ. v. Hokie Real Estate, Inc.*, 813 F. Supp. 2d 745, 752 (W.D. Va. 2011) (State university did not waive its Eleventh Amendment sovereign immunity by participating in federally regulated trademark process regulated by the Lanham Act); *Bd. of Regents of Univ. of Wisconsin Sys. v. Phoenix Software Int'l, Inc.*, 565 F. Supp. 2d 1007, 1013 (W.D. Wis. 2008) ("As a branch of the state, plaintiff enjoys sovereign immunity from trademark infringement suits.").[31]

---

[30]  As the United States Supreme Court declared in *Seminole Tribe*, "For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'"  517 U.S. at 54 (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)).

[31]  *Rev'd on other grounds,* 653 F.3d 448 (7th Cir. 2011).

27

### 3.  <u>Sherman Act</u>

Furthermore, the Department and its employees, in their official capacities, are entitled to sovereign immunity pursuant to the Eleventh Amendment as to a Sherman Act claim.[32]  In *Seminole Tribe v. Florida*, the United States Supreme Court clarified that Congress may only abrogate a State's sovereign immunity if: 1) Congress has "unequivocally expressed its intent to abrogate the immunity," and 2) if Congress has acted "pursuant to a valid exercise of power."  517 U.S. at 55.

With respect to the Sherman Act, the antitrust statutes do not contain a clear intent to subject states to federal court jurisdiction and liability. *See* 15 U.S.C.A. § 15 (containing no statement of intent by Congress to abrogate state sovereign immunity). In addition, the antitrust laws were passed pursuant to the Commerce Clause under Article I of the Constitution. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 111 (1980) ("Congress 'exercis[ed] all the power it possessed' under the Commerce Clause when it approved the Sherman Act."). The Sherman Act was not passed pursuant to Section 5 of the Fourteenth Amendment.[33]  The "Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe*, 517 U.S. at 72-73. Accordingly, unless there is an applicable exception, a State department or entity is entitled to Eleventh Amendment immunity as to the Plaintiff's Sherman Act claims.

---

[32]  Section 1 of the Sherman Act states, "Every contract, combination ... or conspiracy, in restraint of trade ... is hereby declared to be illegal." 15 U.S.C. § 1.

[33]  The United States Supreme Court has specified that it has "held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

As one Court of Appeals neatly summarized:

> [I]t is clearly established that the Sherman Act does not itself apply to state action. In *Parker v. Brown*, 317 U.S. 341, 350–51 (1943), the Supreme Court determined that Congress had not meant to require states to comply with the Sherman Act. Accordingly, a state is free to regulate, or act on its own behalf, in ways that are anti-competitive and would not be permitted to a private individual. *Id.* This doctrine is so well settled that its rationale and underpinnings are scarcely worth discussing. *See* I Areeda & Hovenkamp, *Antitrust Law*, ¶¶ 221–222 (1997).

*Neo Gen Screening, Inc. v. New England Newborn Screening Program*, 187 F.3d 24, 28 (1st Cir. 1999) (lateral citations omitted), *cert. denied*, 528 U.S. 1061 (1999).[34]

The Second Circuit has expressly stated that "the Sherman Act [does] not apply to anticompetitive restraints imposed by the States as an act of government." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 118 (2d Cir. 2003)(citation and internal quotation marks omitted). *See also Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 223 (2d Cir. 2004) ("A statute that permits or compels private parties to engage in per se violations of the federal antitrust laws will be saved from preemption if: (i) the restraint in question is clearly articulated and affirmatively expressed as state policy, and (ii) the policy is 'actively supervised' by the state itself.") (citation and internal quotation marks omitted).

---

[34]  The United States Supreme Court concluded in *Parker*:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its  legislature.

317 U.S. at 350-51.

### 4.   Exceptions to Sovereign Immunity

State sovereign immunity is not, however, absolute.  As set forth *supra,* a State may consent to suit in federal court and/or Congress may abrogate a State's Eleventh Amendment immunity under Section 5 of the Fourteenth Amendment.[35]  *See Seminole Tribe v. Florida*, 517 U.S. 44, 54-55(1996).  Neither such fact is applicable in this case.

However, as described above, the sovereign immunity doctrine also does not bar claims against individual defendants sued in their *individual capacities*.  *Hafer v. Melo*, 502 U.S. 21, 25-27 (1991).   Finally, the  Eleventh Amendment permits a plaintiff to sue a state official in his official capacity, so long as the plaintiff seeks only *prospective declaratory or injunctive relief* to remedy an ongoing violation of federal law. *Ex parte Young*, 209 U.S. 123 (1908).  *See also  Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Edelman v. Jordan*, 415 U.S. 651 (1974); *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007); *Fresh Start Substance Servs., LLC v. Galvin*, 599 F. Supp. 2d 279, 283 (D. Conn. 2009).

### 5.   Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).   Moreover, "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.* (quoting *Pierson v. Ray*,

---

[35]  Connecticut has not waived its Eleventh Amendment immunity in this action.

386 U.S. 547, 554 (1967)).

In the context of § 1983 claims for money damages, the Second Circuit articulated "[t]wo questions [that] inform qualified immunity analysis":

> First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? If the answer to this question is no, further inquiry is unnecessary because where there is no viable constitutional claim, defendants have no need of an immunity shield. But if the answer is yes, or at least not definitively no, a second question arises: was the right clearly established at the time of defendant's actions?

*Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013).

In the case at bar, if Mullen and Anderson exercised discretion in their official capacities as Commissioner and Investigations Supervisor, respectively, their actions neither violated clearly established statutory nor Plaintiff's constitutional rights.  In sum, they may be shielded from individual liability by qualified immunity.

### 6.    Court's Findings

Applying the aforementioned precedents, Plaintiff's action against the Department, as a state governmental entity, and against Mullen and Anderson in their official capacities for money damages, must be dismissed as barred by the Eleventh Amendment.

With respect to injunctive relief against either Mullen or Anderson, Plaintiff's Complaint broadly states, "[t]his is a cause of action for declaratory judgment, to declare the unconstitutionality of the state statute and for injunctive relief to enjoin the Defendants from enforcing the unconstitutional state statute pursuant to 42 U.S.C. § 1983." Doc. 1, at 4.  Plaintiff also states that she seeks injunctive relief from state regulation" and that "Anderson, acting under color of law, threatened to take action against [her] for practicing medicine." *Id.*, at 6.  In essence, Plaintiff seeks

"an injunction against [the] enforcement" of Conn. Gen. Stat. § 20-9.  *Id.*, at 34.  Plaintiff's request for an injunction against the individual defendants will thus turn on whether Connecticut's regulation of medical licenses and investigation of possible violations regarding those licenses is unconstitutional.   As set forth below, because Plaintiff's Complaint fails to state any valid claims, her claims for injunctive relief under § 1983 and/or under the other federal statutes also fail.

To the extent that Plaintiff requests money damages against Anderson in her individual capacity, Anderson is, in any event,  shielded by qualified immunity.  The doctrine of "qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing: that the official violated a statutory or constitutional right, and (2) that right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074 2080 (2011). Specifically, qualified immunity bars suits against state officials if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[T]he existence of immunity turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." *Dube v. State Univ. of New York*, 900 F.2d 587, 596 (2d Cir. 1990) (citations and internal quotation marks omitted).

Therefore, unless a government official's actions are so obviously wrong, in light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have done such a thing, the government official has immunity from suit. *See, e.g.,  Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) ("Qualified immunity gives government

32

officials breathing room to make reasonable but mistaken judgments").

The only allegation Plaintiff has stated against Anderson is that the Department assigned her to investigate Plaintiff for the unlicensed practice of medicine, Doc. 1, ¶ 7.  Such an investigation was encompassed within the State's police power to regulate the practice of medicine and within the duties of Anderson's position.  Anderson, by performing her investigative duties, as mandated by the Connecticut legislature, was not "obviously wrong" so is not subject to liability for civil damages. Anderson  is protected by the doctrine of qualified immunity.  The claims against her in her individual capacity must be dismissed.

## C.    Rule 12(b)(6) - Failure to State A Claim

As set forth below, even if Plaintiff were able to effect proper service on Defendants and/or Plaintiff's claims were not barred by either the Eleventh Amendment and/or qualified immunity, the Court would still be required to dismiss this action in its entirety because Plaintiff has failed to state any facially plausible claims.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678  (2009).  Even exercising leniency toward the *pro se* complaint, construing Plaintiff's claims liberally and interpreting them to raise the strongest argument they suggest, the Complaint fails to state any claim upon which relief may be granted.

### 1.    General Standard

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*.[36]  *See, e.g., Concord Associates, L.P. v. Entm't Properties Trust,* 817 F.3d 46, 52 (2d Cir. 2016)*; Gomez v. Cty. of Westchester,* No. 15-879, 2016 WL 2956821, at *1 (2d Cir. May 23, 2016)*.*  As discussed more fully *infra,* in evaluating facial plausibility, "[*p*]*ro se* complaints are to 'be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Maki v. New York*, 597 F. App'x 36, 36 (2d Cir. 2015) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir.2006)).  *See also Frederick v. Wells Fargo Home Mortg.*, No. 15-1457, 2016 WL 2893211, at *1 (2d Cir. May 18, 2016) ("We will liberally construe complaints filed pro se to state the strongest arguments that they suggest.").

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" *Halebian v. Berv*,  644 F.3d 122, 130  (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis omitted)).  "In ruling on a motion pursuant to Fed. R. Civ. P. 12 (b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (citation and internal quotation marks omitted)).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim[]."

---

[36]  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*,  556 U.S. at 678. Thus, "[w]here  a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.  Accord Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *DiFolco,* 622 F.3d at 113.

In deciding whether to grant a Rule 12(b)(6) dismissal,  the court "constru[es] the complaint liberally, accepting all [well-pleaded] factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chase Grp. Alliance LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (citation and internal quotations omitted). "[W]hether a complaint states a plausible claim for relief  will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  556 U.S. at  679.   Thus, factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

 "Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting  *Iqbal*, 556 U.S. at 678).   *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x  52, 54 (2d Cir. 2011) (same).   The Court is thus not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008) (internal quotation marks omitted)).  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### 2. *Pro Se* **Complaint**

When the complaint has been filed *pro se*, the plaintiff is "entitled to special solicitude" and the court construes "his [or her] pleadings 'to raise the strongest arguments that they suggest.'" *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006)). "[D]ismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Fowlkes*, 790 F.3d at 387(quoting *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008)). In other words, "however inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 413-14 (2d Cir. 1999) (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)).

"At the same time, a *pro se* complaint must allege enough facts to state a claim to relief that is plausible on its face." *Fowlk*es, 790 F.3d at 387 (citation and internal quotation marks omitted). *See also Walker*, 717 F.3d at 124 ("Nonetheless, a *pro se* complaint must state a plausible claim for relief.") (citing *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009)). In particular, *pro se* litigants are obligated to comply with the minimal standards of notice pleading under Rule 8, Fed. R. Civ. P.[37] *See, e.g., Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014). Ultimately, "the rule in favor of liberal construction cannot save *pro se* litigants who do not present cognizable arguments." *Collins v.*

---

[37]    Rule 8 of the Federal Rules of Civil Procedure mandates that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Rule 8 simply "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

*Blumenthal*, 581 F. Supp. 2d 289, 291 (D. Conn. 2008).

### 3.   **Plaintiff's Claims**

#### a.   **Lanham Act and Preemption Claims**

First, Plaintiff has alleged no plausible claims under the Lanham Act, 15 U.S.C. § 1125, and no plausible claims with respect to preemption. Plaintiff cannot allege facts to prove that federal trademark law preempts the state's right to regulate the practice of medicine as defined by the state. Rather, as Plaintiff was previously informed in *Betancur*, her action before the Eleventh Circuit, there is and can be "no rational argument" that Plaintiff's ownership of the Ňedicine trademark "preempts the authority of [the State] to regulate and license the practice of naturopathy," which she now describes as Ňedicine. *Betancur*, 296 F.App'x763. Such an argument was then and is now "meritless."

As the Eleventh Circuit declared in *Betancur*, the state retains the police power to regulate the profession of the practice of medicine. 296 F.App'x at 763 (citing *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910)). *See also Dicara v. Connecticut Educ. Dep't*, No. CIV. 3:08CV627 (PCD), 2008 WL 5083622, at *3 (D. Conn. Nov. 26, 2008) ("The State has the authority, pursuant to its police power, to regulate and license professions and trades, particularly where the public's health, safety, and welfare are implicated, as with education."). "State regulation and imposition of mandatory licensing procedures under the police power has thus been approved with respect to a wide range of occupations," *Dicara,* 2008 WL 5083622, at *3, which include medicine. *See, e.g., Semler v. Oregon State Bd. of Dental Exam'rs*, 294 U.S. 608, 611(1935) (it has long been established and "is not open to dispute" that "the state may regulate the practice of dentistry, prescribing the

37

qualifications that are reasonably necessary, and to that end may require licenses and establish supervision by an administrative board").

### b.   Unfair Competition – Sherman Act and CUTPA

Plaintiff's Sherman Act,  15 U.S.C. § 1,  and CUTPA claims, Conn. Gen. Stat. § 42-110a, *et seq.*, alleging that Connecticut has impaired her ability to compete in the medical field, also  fail to state claims upon which relief may be granted.  As the United States Supreme Court stated in *Watson v. State of Maryland*, "the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health" and "no profession [is] more properly open to such regulation than that which embraces the practitioners of medicine." 218 U.S. 173, 176 (1910). *See also Dicara*, 2008 WL 5083622, at *3 (recognizing the State's "authority, pursuant to its police power, to regulate and license professions . . . where the public's health, safety, and welfare are implicated").  In imposing statutory requirements for the practice of medicine, the state protects the lives and health of the people and ensures that only those "properly qualified persons shall undertake [the] responsible and difficult duties" of practicing medicine. *Watson,* 218 U.S. at 176.   It thus follows that there can be no lawful competition between the state and a private individual's essentially "rogue" scheme of issuing licenses for medical practice within the state.

### c.   Section 1983 and the Fourteenth Amendment

With respect to Plaintiff's civil rights claims under § 1983, even if any individual defendant in this action were properly subject to suit under § 1983, the claims would still fail to state any plausible claim.  Section 1983 imposes liability for conduct which "subjects, or causes to be

subjected" a complainant to a deprivation of a right secured by the Constitution and laws of the United States." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (internal quotations and citations omitted). None of Plaintiff's alleged facts establish that she was deprived of any statutory or constitutional right by Defendants. Because deprivation of such rights is a key element to any § 1983 claim, Plaintiff's complaint fails to set forth sufficient factual matter, accepted as true, to "state a claim to relief" under § 1983 "that is plausible on its face." *Iqbal*, 556 U.S. at 678.

Here Plaintiff claims that under the Fourteenth Amendment, she has been deprived of the use of her federally registered mark by the Department's application of Connecticut state law.[38] The Connecticut state statute of which Plaintiff complains, Conn. Gen. Stat. § 20-9(a), is neither an arbitrary nor unreasonable regulation that has violated Plaintiff's rights to equal protection or due process. *See Watson v. State of Maryland*, 218 U.S. 173, 176 (1910).[39] The Connecticut legislature,

---

[38] The Fourteenth Amendment of the Constitution states, in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

[39] As the United States Supreme Court explained in *Watson*:

It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine. Dealing, as its followers do, with the lives and health of the people, and requiring for its successful practice general education and technical skill, as well as good character, it is obviously one of those vocations where the power of the state may be exerted to see that only properly qualified persons shall undertake its responsible and difficult duties. To this end many of the states of the Union have enacted statutes which

exercising the police power of the state to regulate public health and safety, decreed that no person shall diagnose or treat an individual for compensation, gain, or reward without a state-issued license, Conn. Gen. Stat. § 20-9(a), and made the unlicensed practice of medicine a class D felony, Conn. Gen. Stat. § 20-14.  Therefore, Plaintiff has no right under Connecticut law to be granted a medical license simply due to her Ňedicine trademark.  She thus has no liberty or property interest to practice medicine with that mark.  She has lost no interest protected by due process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).  In sum, Plaintiff has not been deprived of any Fourteenth Amendment right to practice medicine in Connecticut without a state-issued license.

Even exercising leniency toward the *pro se* complaint, construing the Plaintiff's allegations liberally and interpreting them to raise the strongest arguments, her § 1983 claim is fatally flawed. She has not been deprived of any right secured by the Constitution or federal statute.

Furthermore, when individual defendant Anderson investigated Plaintiff's activities on behalf of the Department, and Mullen did not stop the investigation, neither of those public officials violated any established statutory law or constitutional right.  Rather, they were performing the duties of their positions in the Connecticut Department of Public Health, investigating violations of Connecticut's statute regarding medical licenses.  Plaintiff's Ňedicine activities violated that statute. In short, Jackson has no clearly established right to treat and diagnose individuals in Connecticut

---

require the practitioner of medicine to submit to an examination by a competent board of physicians and surgeons, and to receive duly authenticated certificates showing that they are deemed to possess the necessary qualifications of learning, skill, and character essential to their calling.

*Watson v. State of Maryland*, 218 U.S. 173, 176 (1910).

pursuant to her Ňedicine trademark.  Only those individuals who are issued Connecticut state licenses to practice medicine may "diagnose, treat, operate for or prescribe for any injury, deformity, ailment or disease . . . in the kind or branch of practice stated in such license."  Conn. Gen. Stat.. § 20-9 (a).

### d.   Dormant Commerce Clause

Finally, with respect to Plaintiff's Dormant Commerce Clause claim, that clause, relating to Article I of the Constitution, recognizes that because Congress has been given power over interstate commerce, states can neither discriminate against nor improperly burden interstate commerce. However, as the district court declared in *Jonson v. State of Washington*, brought by a Ňedicine licensee, none of Plaintiff's "disparate constitutional claims which [she] claims permit [her] to practice 'Ňedicine' . . . rise[ ] to the level of plausibility."  Doc. 30, at 3.  "[T]he regulation of medicine has long been understood to lie within the state's police power."  *Id.* (citing *Hawker v. People of New York*, 170 U.S. 189, 192 (1898)).  It cannot, therefore, be rationally alleged that Defendants are pre-empted from investigating Ňedicine activities under the Dormant Commerce Clause.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. 28] is GRANTED.  First, the Court finds that Plaintiff failed to make sufficient service of process on Defendants, Fed. R. Civ. P. 12(b)(5), so that the Court lacks personal jurisdiction over them.  Second, Plaintiff's federal claims are, in any event, barred by the Eleventh Amendment against the Connecticut Department of Public Health and its officials acting in their official capacities with respect to money damages.  Because the United States Supreme Court has interpreted the language of the Eleventh Amendment to bar

federal jurisdiction over suits against states, this amendment, when applicable, effectively deprives the Court of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1).  *See Kimel v. Florida Board of Regents*, 528 U.S. 62, 73 (2000).   Third, with respect to Plaintiff's § 1983 claims against Commissioner Mullen and/or Investigations Supervisor Anderson, in their official capacities, for injunctive relief and/or against Anderson in her individual capacity, those claims fail to allege the deprivation of a constitutional or federal statutory right and/or are barred by qualified immunity.

Finally, even if Plaintiff could perfect service on Defendants, if given another opportunity, and/or Plaintiff's federal claims were otherwise allowed to  proceed in part against the individual Defendants for prospective or injunctive relief, Plaintiff's entire Complaint is devoid of any claim upon which relief may be granted, Fed. R. Civ. P. 12(b)(6).  The State's police power extends to the regulation of professions which impact public health and "no profession [is] more properly open to such regulation than that which embraces the practitioners of medicine." *Watson*, 218 U.S. at 176. Accordingly, Plaintiff's Complaint is DISMISSED in its entirety WITH PREJUDICE.[40]

In sum, Plaintiff fails to comprehend that her federal trademark is not a license for her to practice medicine in the state of Connecticut.  She erroneously believes that she may coin a new word for administering medical treatment, Ňedicine, set her own standards for that practice, and issue medical  licenses based on her own purported authority, or that of a corporation she controls. She has argued, without merit, that a federally issued trademark for her self-styled "Ňedicine" somehow trumps Connecticut's exclusive "police power" to regulate the practice of medicine within its borders. She is mistaken.  Due to Plaintiff's issuance of unauthorized licenses for medical practice

---

[40]  Because amendment of Plaintiff's claims would still be subject to dismissal under Fed. R. Civ. P. 12(b)(6), such  amendment would be futile.

and her unlawful treatment of patients in Connecticut, the Connecticut Department of Public Health and its officials have justifiably investigated Plaintiff's Ñedicine activities.  Further litigation by Jackson of this matter, in this District or another, would be frivolous.

In light of the Court's Ruling herein, dismissing the action in its entirety with prejudice, Plaintiff's "Emergency Motion for a Restraining Order" [Doc. 39] is DENIED as moot.  The Clerk is directed to close the file.

Dated: New Haven, Connecticut
             June 20, 2016

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

43